Mr. Morey, if you're prepared, please proceed. Yes, thank you, Your Honor. May it please the Court. I'm R. Henry Morey. I represent both Northshore Mining, Matthew Zimmer, and Roger Peterson. I have asked to reserve five minutes for rebuttal, and I recognize, of course, that may get at the Northshore Processing Facility. What they process is taconite ore into iron ore pellets, which are a combination of the ore and bentonite. It's a big process. This is actually a very small part of that plant. It carries the pellets, the finished pellets, out of the pelletizer into a storage bin before they're loaded on ships on the Lake Superior. A quick question. Any place in the record, is there a picture of this or a diagram? A picture? There is a picture in the inspector's notes of his pictures of this whole conveyor gallery. Is it in our record? I'm sorry. Yes, it is in the record. Okay, thank you. We'll try to find it. Go ahead. But I do want to say that there's no picture of the whole facility. No, no, no. I just was interested in where all this happened. Go ahead. Okay, and the inside of this conveyor gallery has two conveyors. They are nuts. They are parallel, but there's a six to eight foot walkway between them, and on the outer edges, there are two 30-inch walkways. The east walkway, which is the issue here, and the west walkway. The walkways, this is an older plant. The walkways were built years ago by, they erected the steel, of course. They put perlite panels. Perlite is sort of an aggregate. It's lighter than concrete. They put perlite panels down for a form, just like we all use when we're laying concrete out in our own world, and then they put concrete on top of it. What you could see from the bottom is the perlite. You could not see the concrete. There are no pictures in this record, Your Honor, of the actual inside of the conveyor gallery. What happened, well, to give you a little bit of history of this, back in 2014, one of the engineers at Westshore had a concern about, he thought the center walkway looked odd, so he referred it to engineering. He didn't refer it as a safety complaint. Otherwise, he would have referred it to the safety department. Counsel, is it accurate to say that the perlite had been deteriorating already for several years, as far back as 2009? Uh, yes. Now, the interesting thing about that, Your Honor, if I may, while the perlite's deteriorating, and as Mr. Francine said, he didn't expect it to last as long as it did, because it is only a form, you couldn't look up and see holes through the perlite through the concrete. You could only see the perlite and some of the reinforcement for the perlite. You could not see any of the reinforcement for the concrete. The company, after the issue was raised, when the engineering department went out, he then, Mr. Scamhorn, asked for Crick Argyard, which is an engineering consulting firm, to come out and take a look at it. They took a look at it. They didn't do any testing or anything, and since there were previously installed steel plates in the center walkway, which is the principal walkway through this area, he just calculated its strength based on the steel, not the concrete. He didn't do any testing. There weren't plates out on the outer walkways, and so he just did it visually. He issued a report in 2015, which is obviously a major issue in this case, where he said the heavy equipment on the center walkway should be prohibited and access to the outer walkway should be restricted. Difference in language. Did he also make a recommendation for replacement? He didn't recommend how it would be replaced. He did say that at some point it should be replaced. What happened is when they got the report, they said, what do you mean? Was it at some point? Was that the language? Well, he said before full access, you should restrict access until it's replaced. Restricted, right? We're all familiar with restricted access. I assume I could walk around your courthouse and see electrical boxes as well as rooms and that are restricted access. What they did when they called him and they said, well, what do you mean by this? They talked about it and they came up with the conclusion that they could permit access using fall protection. Fall protection is pretty standard in the industry. That's what they did. In September of 2016, they wanted to clean the outer walkways. We all understand the cleaning is normally done from the middle walkway, but you use a hose. One of the things that does is that pushes pellets over to the outer walkway. They decided they needed to clean the outer walkway. They assigned three people from a contractor and before they went out there, they said, you have to wear fall protection. One of the North Shore employees went out with them and showed them how they could use fall protection. Essentially, what you do, you attach to one structural steel member and then walk down the walkway and attach to another one and release your lanyard. Recognizing these are also fall protection that is retractable. Once there's a pressure on it, it stops. It's a little bit different than just a piece of rope or a piece of steel cable that will stop you after six feet. What does the record show was the response to the report that basically says this needs to be replaced? It's not structurally sound. It sounds like things just kept going and got dirty and so let's clean it. What's taking place to indicate there's an effort to remedy the apparently dangerous condition? I'm not sure we can argue about whether it's actually dangerous. I think the report used the phrase not structurally sound, which meant nobody's supposed to be on it. He said restrict access and that he didn't mean nobody is supposed to be on it. It says not safe for personnel to be using until a repair has been completed. That's what it says, but he said restrict as opposed to prohibit. If he wanted to prohibit, he would have said prohibit. That's the difference. Recognize that this is a major, to replace this walkway is a major capital project. To do a major capital project, recognizing also in between 2015 and 2016, the plant was idle for about six months. The pellet market wasn't good. That sounds like a perfect time to do the repair. It's not the perfect time to spend significant money if you're not sure if the plant's going to continue to operate after the idling. Yes, you could say that, but the problem is you don't know whether after the idling they were going to come back. The pellet market is very subject to a lot of ups and downs. For those of you who don't know case law, this is an old facility that goes back to Cyprus back in the 1970s where I read the environmental case in law school. This is the same facility, but that was an environmental case. What they did is in the meantime, while they could decide when to do this, they decided to use it. Recognize that this walkway isn't used very often. There are two reasons to use it. One is to clean it. The second is to climb over the conveyor when it's locked out to install an idler roller. In September, when these contractor employees were cleaning it, there was a steel failure. Now, this steel failure, there's really no dispute. Well, perhaps Mr. Superfesky disputes it, but what happened was there was a prior damage to one of the steel trusses back in 1994 probably. That truss was overloaded during the cleaning process. All you need to do is look at the piled up. Pellets are heavier than a lot of different materials. They weigh about 130 pounds per square inch or square foot. That truss failed. In the truss failing, it caused the walkway, outer supports for the walkway, which were clip angles, to bend outward and cause the walkway to twist and it caused it to break. Obviously, the issue is whether or not we, you know, what role did the walkway play in this? Well, one of our experts, Mr. Osmundson, said it very clearly. Concrete is not support for the structure. It is simply a load on the structure. The steel supports the structure. I think Mr. Francine explained what happened pretty succinctly and you can look at it from the evidence. The question is, and I will address the whole issue of a flagrant violation first and then the individual penalties. If you have questions about others, that's fine. The question is, is whether or not this was a flagrant violation. The ALJ said that it was not because it was not reckless in the sense of flagrant and the commission said it was not reckless in the sense of flagrant and it also didn't meet the gravity test because they said the only hazard here that was actually proven was falling on the walkway and they didn't think that. Mr. Moore, one of the disputes here in the flagrant, as I understand it, is just what you've highlighted. Is there a different type of recklessness for flagrant than in the other violations? I have a question about that. Why would there be a different definition in this system for reckless there? It's not a different word, it's the same word. When it seems like under flagrant, what makes it a more serious violation is the failure to respond to a known violation. In other words, I think the parties talk about the history of the bad actor trying to get the folks who know about these violations and either recklessly or repeatedly fail to do anything about it. Why shift the change between a regular violation of flagrant reckless and not the other factors? The other factors also are heightened because of the difference between flagrant gravity and significant and substantial under the act. The whole history of that act was promulgated in 2006. Congress wanted to get the bad actors. The initial penalty was $220,000, which was only $30,000 less than the criminal penalty. It now, because of the Civil Penalty Adjustment Act, actually exceeds the criminal penalty. It's a very heightened violation. The commission looked at the only other use of reckless in the statute. Prior to 2006, it wasn't used. They put it in section 110. They also put it in a with respect to mine rescue teams. They looked at that and said, well, yeah, it's more. Now, I will say that even if you accepted MSHA's definition in their regulations of reckless disregard, they say it's reckless as long as there's absolutely no mitigating factors. Well, we have mitigating factors here. What about the commission's reference to the common law? They seem to look to the restatement. The restatement seems to include both conscious disregard and an indifference, which I think is what the secretary is getting at. Why cut out the indifference aspect of the definition of reckless here? Where do I get that? Well, why do we go there? I think we have to be careful applying the restatement to statutory provisions where the Congress wrote a statute that really exceeded any other sanction in the act. All right. All right. So let me go with you there for a minute then. If you don't go to the restatement, where do you go? You're saying what Congress did in this statute and said reckless or repeated failure. So tell me where to go to find the definition that you're looking for or are asserting is the proper one. Well, that's the problem is finding that. But I would say that it is something more than reckless in the restatement. It's something more than standard penalty calculation. What from Congress, Mr. Moore, what from Congress tells us that, that the reckless is different there? I think the nature of the whole sanction, particularly the different language and also the amount of the penalty. The amount of the penalty is quite penalty. When I was talking to a client and what that client who processed their civil penalties said is not actually repeatable because she was just astonished how high it was. It's very, very high. And so that suggests that or indicates that Congress was looking at something more than that. And so, quote, the other parts of the reasonable expectation of a substantial bodily injury, that's heightened above what they previously looked at when they had significant substantial. Mr. Moore, you're well within your rebuttal time. You can continue if you like, or you can reserve. Let me go ahead and reserve, if I may. All right. I don't see any additional questions. Thank you. Ms. Mullins. Good morning. May it please the court. My name is Rebecca Mullins. We're here because MSHA proposed a flagrant penalty against North Shore for recklessly failing to maintain an elevated walkway despite knowing for years that the walkway was in disrepair. This hefty flagrant penalty designation originated in 2006 with the passage of the Miner Act. Congress passed the Miner Act in response to a series of mining tragedies that left 19 men dead in order to incentivize operators to proactively correct known violations. Operators like North Shore, who equipped with a third-party engineering report that detailed an unsafe walkway that was unsuitable for use absent repairs, made no repairs, and instead continued sending miners onto the crumbling walkway for over a year until, predictably, the walkway collapsed. The flagrant definition we're talking about is found at Section 110B, and it defines flagrant as a reckless or repeated failure to make reasonable efforts to eliminate a known violation of a mandatory safety standard that substantively, approximately caused, or reasonably could have been expected to cause death or serious bodily injury. The ALJ in this case found that the Secretary proved each portion of flagrant except for the reckless portion, reasoning that recklessness in a flagrant context required some sort of heightened recklessness. The Commission agreed with the ALJ and found that in order to establish a reckless flagrant violation, the Secretary must prove a conscious or deliberate disregard that an operator consciously or deliberately committed a crime. The ALJ have taken into account some of the, I guess you might consider it a form of mitigation of trying to have the workers secure themselves, that it wasn't where they didn't think there was some concern for their safety. So they were trying to teach them, you know, you need to do this while you're out there, that that wouldn't, that there would be something higher than that, and that would be the flagrant disregard as opposed to just a non-flagrant disregard. Yes, Your Honor, the judge did rely on this fall protection policy as, I guess, mitigation in the reckless flagrant context, although she did not rely on it when evaluating whether this the flagrant analysis requires some sort of heightened recklessness. But the statute, the flagrant definition doesn't account for a failure to eliminate the hazard, it's a failure to eliminate the violation. And as the Commission affirmed, as supported by substantial evidence, fall protection did nothing to eliminate the violation, which was an unsafe walkway that was crumbling and in disrepair. And further, as the ALJ found, fall protection wasn't even used at all times. Minors were on the walkway without fall protection, and MSHA had witnesses who testified that even with fall protection, this is intended to be a secondary means of protection, and so you can still sustain serious injuries while wearing fall protection. If you were to fall 50 feet from this elevated walkway, fall protection may save your life and prevent you from hitting the ground below, but it's, if you could still, a minor could still suffer serious injuries from the risk, I mean, the force of the fall, being caught by the fall protection, or being impaled by crumbling pieces of walkway. So the fall protection here did nothing to eliminate the violation, and it should not have been considered in the context of reckless flagrant. Now, is nothing too strong, counsel? Surely it did something. Your honor, nothing to eliminate the violation, whether it may have targeted the underlying hazard. I think that's, I think that's circular. Go ahead with your argument. Now I get your whole sentence. Go ahead. It's circular. Go ahead. Thank you, your honor. But the judge should have just applied recklessness as it's understood in common law, which is that the operator knew of the facts but failed to appreciate the high degree of harm, although a reasonable person in their would have done so. Here, North Shore was equipped with an engineering report that deemed this walkway. Counsel, were you relying on the restatement there? Yes, your honor. Okay, proceed. Thank you. North Shore was equipped with an engineering report that detailed that these walkways were unsafe to use, absent repairs, and there is no evidence at all in the record that North Shore did anything to repair the walkway. The report said that the both layers, not only the perlite but also the concrete topping, provided little to no structural support. They could not be safe for use until a repair had been completed. They detailed many types of damage, de-spalling and delaminated concrete, de-bonded reinforcement, but also in the topping layer, they noted that the topping slab was in poor condition and in need of replacement due to information. A reasonable person would have appreciated the high degree of risk involved and would not have instructed miners to work on this walkway until repairs had been completed. The commission seemed to grapple with the idea that flagrant should require something more. There's a high penalty. This should be something bigger, but the commission's error was in the commission's responsibility for crafting its orders and the results it reaches and its interpretation of the regulations it's enforcing. Here, Your Honor, the language of the statute is not ambiguous, and so Congress' intent is what should control this analysis. They chose the intentional. If Congress had intended for something beyond recklessness to be what was required, they could have used a word to indicate such. Well, they used the word flagrant, right? I mean, there's got to be a difference between reckless and fragile and reckless, the way this seems to be established. Your Honor, I think in defining flagrant, they chose the word reckless because that high level of negligence is all the secretary has to establish. The thing that makes flagrant different... What distinguishes something from being reckless and being flagrantly so? Your Honor, flagrant would also require the secretary to establish that an operator knew that the violation existed and failed to make reasonable efforts to eliminate. So, the distinguishing factor isn't an exceptional recklessness or heightened recklessness. The distinguishing factor comes in requiring the secretary to show that the operator had knowledge of a violation and failed to take reasonable efforts to eliminate the violation. Here, the commission... Counsel, would you agree that there are different definitions of reckless that sort of seems to be the restatement and different parts of the restatement sort of emphasize conscious or deliberate or indifferent? So, why doesn't it make sense for the commission to just to pick a portion of the restatement that requires the conscious disregard in light of the bad actor goal? Yes, Your Honor. I believe the commission's interpretation essentially eliminated negligence. So, recklessness, regardless of the definition, indifference, lack of care, failure to appreciate, they all include what a reasonable person would have done in the circumstances. Here, the commission required conscious or deliberate expectation of harm. But that's a part of... That can be a part of reckless definition, can't it? Conscious disregard. In terms of the reckless disregard funding... No, I'm sorry. Just in trying to figure out what reckless means under the flagrant violation section, there seems to be, at least in my understanding of the restatement and the common law, the different definitions that the commission was pulling in to look at, it seems like conscious disregard is in that fix. Your Honor, I agree. I think the commission here clearly stated that they wanted this to be something beyond recklessness. And so, the secretary's point is, if it were supposed to be heightened recklessness, more than recklessness, Congress could have chosen a word to indicate that. They chose the word recklessness, which seems to account for what a reasonable person would have done in this situation. Here, the company was presented with an engineering report that said, in no uncertain terms, that it's not structurally adequate for use. I was really glad you said it about the third time, but every time you say reasonable person, I think, well, that's plain old negligence. And often in state law and under the restatement, recklessness is something more than that. Now, let's don't pursue that. Let's pursue Judge Kelly's line. Why? Now, who are we? I'm sorry. I'm going to change on you here. I don't know you answered Chief Judge Smith's question. At least I didn't understand it. As you know, where he's worried about Chevron deference. Do we do that to the secretary? Do we do that to the commission? Do we give deference to anybody in this circumstance? Do you have any law on who we give deference to in these kind of fairly rare cases? I think we've had two. Go ahead. Yes, your honor. So my answer was that we feel it's unambiguous. If the court finds that it is ambiguous, we would say deference to the secretary's interpretation. And this court in Pattinson Sand has also recognized deference to the secretary's litigation position before the commission. Well, I didn't get to my other question that I deserted on you. I'm going to undesert it now. And so let me ask you this. This is in regard to what Judge Kelly was pursuing. A conscious disregard is certainly in a lot of laws as being reckless. It's it's in a lot of laws and it's in the restatement. So so it seems to me why isn't it within the commission's realm of deciding cases to say, well, for this purpose, we're going to use this definition reference for another purpose. We're going to use that definition. And that's what courts do all the time. Yes, your honor. One thing that I haven't that I think may help to answer more clearly. The commission also required. And conscious, really the expectation of harm. And so part of recklessness is not intending the resultant harm. That's, you know. That takes it almost into a level of criminal. And so even if you were to apply conscious or disregard as the words, it would be a conscious or just conscious or deliberate failure to eliminate the violation, not conscious or deliberate expectation of harm. So the secretary should not have to establish that North Shore, by failing to repair the walkway, was intending to harm minors. Rather, the language of the statute is a reckless failure to make use of conscious or deliberate, a conscious or deliberate failure to make reasonable efforts to eliminate, rather than a conscious or deliberate expectation of the resultant harm. And in this case, North Shore was provided with an engineering report in addition to having received complaints as early as 2013. I believe Mr. Moore agreed that the perlite layer was in addition to those work orders that notified them of the walkways condition. They had a report in 2015 that said they were not, you know, structurally adequate for use and should not be used absent repair, not safe for personnel to be using absent repair, I believe is the exact language. And so a conscious or deliberate failure to make efforts to eliminate the violation, if you were to adopt the commission's language, would be more appropriate than an expectation of resultant harm. Because as Commissioner Treanor pointed out in his dissent, reckless disregard is unintentional but highly negligent. You intend the act. You don't necessarily have to prove intent the resultant harm to the minors. There was another component of the flagrant definition that the commission reviewed that the judge had previously found the secretary established. That is in the reasonably could have been expected to cause death or serious injury. As the commission noted, at the time that Congress passed the Minor Act in 2006, the imminent danger definition was already part of the act and it is functionally identical to the language that Congress put into the flagrant definition. And so the commission has interpreted and has recognized that Congress did not intend for the imminent danger language, which is reasonably could have been expected to cause death or physical physical harm. Here, it's reasonably could have been expected to cause death or serious bodily injury and that Congress didn't expect that to require a specific percentage of probability. And the commission has interpreted that even showing a reasonable potential for harm can satisfy the imminent danger context. And so the secretary believes the commission erred here in requiring the secretary to show first an expectation of a hazard and then second an expectation that that hazard would result in a serious injury and instead should have just adopted the imminent danger test, which is a reasonable possibility. The substantial evidence supports the judge's finding on that prong. There was evidence from the secretary's witness that the walkway, if it had been maintained in good condition, that it would not have collapsed as it did, even when the beam failed. There's a third-party engineering report that details all of the issues with the walkway, determining that it's not structurally adequate for use. There was testimony in the record that miners who were North Shore employees, unlike the miner who was on the walkway when it failed, who was a contract employee, but actual North Shore employees were scared to use the walkway because they knew it was in collapse. North Shore had to install a mesh underneath to prevent pearlite pieces from crumbling and falling on miners who were walking underneath. And so the substantial evidence supports the judge's determination that it was a reasonable potential of a reasonably serious injury. And counsel, in your remaining time, would you address your appeal as to the conclusions on individual liability? Yes, Your Honor. So Section 110C authorizes the secretary to pursue individual liability against an agent who knowingly orders, authors, or carries out a violation. The administrative law judge found that these two members of management, Mr. Zimmer and Peterson, did knowingly order, authorize, or carry out a violation. The commission applied a different and we argue incorrect legal test in reversing the judge on that point. They looked to a prior case of theirs, Maple Creek, to say that these members of management could not be held liable because they did not themselves have the ability to initiate extensive repairs. That repairing the walkway was going to cost $300,000 and that to do that was really a decision of the engineering department. First of all, the statute says knowingly ordered, authorized, or carried out. These members of management authorized and carried out when they participated with a member of the engineering department, Mr. Skanehorn. Counsel, you added the word participated. Authorized the violation? Now you're not relying on authorized, are you? Authorized and carried out. Carried out, I think. No, no, no, no. Go slowly with me. It says or. I'm doing one at a time. Authorized, knowingly authorized the violation. Yes, your honor. I believe that their participation in the conversation with Mr. Skanehorn, where they collectively decided not to repair the walkway, but instead to implement fall protection, would constitute authorizing the violation. OK, so you think that's a level of authority now now carried out? You think they knowingly carried out the violation? Yes, your honor. OK, now what's wrong with the commission's general line of cases that you've got to be in a position to repair it? That's the violation here. Well, in Maple Creek, the commission don't go to Maple Creek. Help me with in a position to repair just those words. Your honor, not remedy the violation, but repair or eliminate the hazard is what the Maple Creek court said. And here these men could have eliminated the hazard. The hazard was was minors working on an unsafe walkway. Both of these members of management testified that they had authority over the workforce and they could have prevented minors from working on the walkway. So perhaps they could not have themselves undergone the necessary paperwork to get it. Correct my understanding of the facts. There had been a severe limitation of access to that and the injury occurred when they were sent someone out to to clean the area as opposed to using it for normal mining purposes. It wasn't hadn't it already been restricted prior to the accident? I don't know that I think it was a walkway that was not very often in use even before this report. So I don't know that they limited any further the frequency of use on the outer walkway. But there was still evidence in the record that minors use the walkway for cleaning and for continued for roughly a year. To conclude that someone in a supervisor position is able to remedy the the problem what level of what what's the proof that needs to to be shown that they actually had the power to get the funds or acquire the funds to make the does that have to be something within their sphere of authority or do they just need to be able to establish that they made the appropriate recommendations? Based on the language of the statute we would say as long as the an agent knowingly which has been interpreted to mean in a position to protect employee safety and health and fail to act on that information if they knowingly authorized ordered or carried out that would be sufficient to establish liability regardless of whether they themselves could remedy the violation. I see that amount of time if the court would permit me to make one final point I would just say that when you look at this through the backdrop of why the Minor Act was passed in response to a series of tragedies that resulted in 19 deaths certainly it seems wanted to incentivize miners to I mean operators to repair violations when they knew of them in order to protect miners and in this case they had a third party engineering report and it begs the question that if this is not flagrant what would be? Thank you for your time. All right thank you Ms. Mullins. Mr. Moore your rebuttal. Okay thank you very much first of all let me comment on a was demolished it clearly wasn't in crumbling form it came out in 16 foot lengths at times and they needed a jackhammer to take it apart. Second if we're talking about a fall we're not talking about a fall of 50 feet the lanyards they were wearing wouldn't have permitted that and in fact what was shown by the event that occurred is you weren't falling anywhere on if I guess if Mr. King hadn't been wearing fall protection he might have fallen down on top of the walkway and steel that was still there but I and I'll also comment that I do I judge Kelly that my feeling is if you use conscious disregard there wasn't a conscious disregard here they took steps now you're saying well you know the solicitor is saying well you need to repair it well that is not something that happens instantaneously and frankly if they wanted to repair it they still have to clean it to get all the pellets out of there. To comment I'd like comment on the deference issue. Deference obviously is changing but it's interesting if we all go back to Chevron the interpretation there. Before you do that counsel in Patterson did we say we looked at the secretary not the commission? Yes you did. Okay thank you. And that's the the other circuits have said that too. Oh thank you for that. The question is whether or not any sort of deference is appropriate here. I think the language is plain but what we don't have is any kind of what we had in Chevron was a promulgated rule that interpreted the statute. We have nothing like that here. The closest we came is back I think in 2008 they put out a policy document which they removed which they withdrew. We don't have anything like that and I'm a little reluctant for the court to take the position well we'll defer to the litigating position particularly when the litigating position includes an assertion that fall protection is unsafe. We know that fall protection is a standard form of protection and Mr. Superfesky's arguing that it was unsafe is contrary to the secretary's own rules. It's contrary to OSHA's rules and it's contrary. I looked at the secretary's website yesterday. Last year they issued 112 violations for 56-15005 which is the fall protection standard. I want to talk a little bit about the council. You're out of time. Do you have just anything to add? Well I've addressed the individual cases in the brief. Thank you. All right. Thank you Ms. Mullins. Thank you Mr. Moore. We appreciate council's participation and argument this morning and we'll continue to review the record and do the best we can with a prudent decision. Thank you. Council may be excused. Madam Clerk I believe that concludes.